Good morning, Your Honors. I'm Robert Stralecki for the Philan. I want to thank you for the opportunity to present oral argument in this case and again to address the issue as to why Crystal Malak died so unexpectedly and unfortunately we tried to have that question answered by our jury of 12 some time ago but in our position we were impeded in that process by some errors of the court and the rulings that were made and not allowed to give a fair presentation of the evidence as the jury should have heard it. This case involves a lady who died so unexpectedly and embodies the doctrine of res ipsa loquitur and the concept of circumstantial evidence which we believe was the trial court struggled with in coming to grips with those This was a situation where this lady underwent a procedure that was within the exclusive control of Dr. Tata which involved a number of medications and various syringes on a nail stand which he drew and used during the course of this procedure. It was a cardiopulmonary arrest. We had ample expert witness testimony in this case to establish our case and present the theory that if lidocaine had been inadvertently administered during the course of this procedure it would have caused exactly what happened here and there was no disagreement among any of the witnesses including the defense expert witnesses that lidocaine introduced through a hole in the dura would disrupt the nerves that control the diaphragm and lead to a respiratory collapse. And what evidence was there in the record that there was in fact lidocaine injected? Any or none? It is all circumstantial. I would agree with that. And what the trial court struggled with was the concept that the medical examiner's office who performed the autopsy for whatever their purposes did not choose to do a toxicology screen. And your expert, Dr. Piles, said he was I believe the quote was just speculating as to whether or how Dr. Tata could possibly have injected the lidocaine? That is the point that our judge, Judge O'Gara, was hung up on. But I think that needs to be seen in the clarity of what he was speculating about which any expert would always have to speculate when you have a res ipsa situation. Dr. Tata injecting this lidocaine as we believe he did, did not do it intentionally. He had no knowledge he had done it. Therefore, he is not going to make any record of his doing it. But from the scientific evidence, that is the only plausible explanation of the respiratory arrest that led to her death. We had the circumstantial evidence of Dr. Tata drawing up his own syringes. Dr. Tata's own admission that he drew up eight cc's of lidocaine for an intended purpose of only using two cc's to create the skin wheel, deaden the skin so he could place his needle. So we have lidocaine unaccounted for that by Dr. Tata's testimony he simply wastes it at the end of the procedure with no explanation as to why he drew that up. The other strong piece of circumstantial evidence is the hole in the dura. There is no question. Let me ask you this. Dr. Tata drew up eight cc's of lidocaine. He intended to use two. Was there any evidence of how much remained in the syringe? Under the policies or protocols at this surgery center, this was not a hospital, this was an outpatient surgical center, they don't keep track of the amounts of medications used. And with very much importance the saline solution that was used. There is no accounting for saline. The evidence that we were portraying in this case that more likely than not inadvertently when Dr. Tata was finishing his procedure and flushing the steroid solution with what he thought to be saline could have in fact been lidocaine syringe that he picked up. Because of what he testified to. He testified that he emptied the 10 centiliters syringe by evacuating the remainder after he used the two cc's of solution into a reservoir on the procedure kit. That's what he testified to and there's no evidence of the contrary. That is his defense and his thought process of what I truly believe he wants to believe happened here. I don't think any physician would, certainly he would not knowingly inject lidocaine when he was not intending to. So if he did not know he did it, if an inadvertent error had occurred that he picked up one of the wrong... Well if he doesn't know whether he did it and you have no evidence that it was ever even done, how could a jury ever, ever draw that conclusion other than by pure speculation? Because it absolutely explains the mechanism that led to her death. No, you explained the mechanism of her death when you said it was caused by a deprivation of oxygen to the brain that would not have occurred if Dr. Bird hadn't violated the standard of care by placing an endotracheal tube in her esophagus rather than her trachea. Let me explain that distinction. Dr. Bird, a jury could easily find Dr. Bird as the bid libel in this case because he had an opportunity to reverse what was going on. To put an endotracheal tube properly and to oxygenate her because she was unable to breathe on her own due to the lidocaine paralyzing her diaphragm. The scientific evidence that we presented through our expert witnesses, which was agreed to as a logical scientific mechanism even by the defense experts, is that with a hole in the dura, with now a communication into the subdural space where the nerves of the spinal canal exist, if you put an anesthetic agent in there, it's going to do what anesthetic agents do. Let's get to more basic. What was Dr. Piles allowed to testify to after the judge changed his ruling? Basically, Ray Sips had talked there. He said if Tardik had inadvertently injected lidocaine into the esophagus space, she would not have been able to breathe and that it would have been a deviation of the standard of care. Is that what he testified to? That's what he testified to. And then he was forced to testify that he was purely speculating as to whether he actually did that. He was purely speculating as to exactly what Dr. Tardik did when he did it because there were no witnesses to this other than Dr. Tardik. He said he was purely speculating as to whether Tardik could have possibly injected lidocaine into him. Your Honor, what he was saying was that he wasn't there to observe the exact action that Dr. Tardik was involved with, but with a hole in the dura and with ample lidocaine unaccounted for, a volume of lidocaine unaccounted for, and a mechanism of death that is completely explained by lidocaine entering this hole in the dura into the subdural space. So he was only speculating as to when precisely in the procedure did Dr. Tardik perhaps inadvertently pick up the wrong syringe or inject the wrong medication because that's under the exclusive control of Dr. Tardik. He said he would be the only one to tell us that and he doesn't even know that he did it. He said he didn't. He said he didn't. Don't say he doesn't know. He said he didn't. You just don't believe him. Well, he said he didn't in the context of, you know, having done thousands of these. He said he emptied it in the trap. That's what he said. That's what his testimony was. Was there any evidence of lidocaine in the plane, I mean, in Ms. Mellick? Well, see, the only evidence would have been had a toxicology screen of the spinal fluid had that been done by the And again, there was no toxicology. But there was no other confident cause of death. What did Dr. Pousen say? I'm sorry? What did Dr. Pousen say? Well, Dr. Pousen adopted the defense position that this lady, for whatever reason, had a sudden cardiac arrhythmia that Since she had an enlarged heart, abnormal condition of a person of her age, related her death to sudden cardiac arrhythmia, and stated without qualification that an epidural injection did not cause her death. That was an opinion that was not shared by the medical examiner who performed the autopsy and described the enlargement of the heart as being nothing out of the ordinary for a woman of this age. But that's what you're reasoning for. You know, one witness says one thing, another witness says another thing, and 12 people have to decide what's true. The scientific evidence, I believe, was overwhelming, and that's why our primary argument is that this was a verdict against the manifest weight of the evidence. It was compounded by the fact of the way the rulings had ensued that I was, even though I had asked for some additional time to prepare an opening statement after this ruling, which in a sense gutted my case as to Dr. Tata, I had to give an opening statement and explain why Dr. Tata was sitting in the courtroom without any explanation as to why Dr. Tata was sitting in the courtroom. I was forced then to put Dr. Tata on as a witness because I needed him to establish the facts, but I was unable to ask him those pointed questions which formed the basis of our theory against him. It was only after the court had reversed itself that that was allowed to be brought into the case, but we were well into the case by that point, and a crucial opportunity to convey our theory to the jury was lost. I mean, what more could your expert have said? What more could Peierls have said than what he did say? He couldn't have said anything more. There wasn't another thing he could have said in an opinion, is there, than what he actually testified to? He'd have to admit that he was speculating as to whether there actually was an injection of lidocaine, because he wasn't there. He probably couldn't have said more, but he was the first person to say that in a courtroom. I had no opportunity to make that presentation in my opening statement. You certainly had an opportunity to pound away at it in your closing argument, though, didn't you? I did. Okay. All right. I mean, it occurs to me that what your expert was allowed to testify to was, in fact, a Ray Zipson theory. You know, in essence, what it was. It would have been a lot better if those motions in limine hadn't been granted. Well, I don't want to also leave out the fact that there were additional errors that I think all compounded and made the cumulative effect, one being this issue of the medical literature. I did have an opportunity to cross-examine and attempt to impeach Dr. Tata, statements taken from these articles written by Dr. Timothy Lubinow, which I did in the proper way and use of medical literature in a trial, and that is as impeachment purposes, but I did not attempt to introduce those as direct evidence through Dr. Piles. It was then through the redirect by defense counsel of Dr. Tata that she was able to do with those articles what she never would have been able to do with those articles on direct examination, and that was to have Dr. Tata comment on the data and the findings of the author, Dr. Lubinow, who was not in that courtroom subject to cross-examination. So inadmissible hearsay was allowed through a rehabilitation of Dr. Tata that is contrary to the use of medical literature under Illinois law. I'm willing to bet you that when Mr. Grant gets up here, she's going to say you opened the door and she slammed it. So, I mean, I know what her argument is going to be already. But I opened the door to the extent that it's allowable to simply read statements from a learned article and ask if he agreed or disagreed with those statements. That's what is allowable with the use of medical literature in cross-examination, but I would have never been able, through Dr. Piles, my expert, to get him there and turn into Dr. Lubinow and re-examine these studies and the methodologies and the findings, but that was done by Dr. Tata. And, you know, lastly, the argument about...  Did you ever object on the basis of hearsay or on the basis that it constitutes substantive use of medical evidence? That was brought up. Did you move to strike it on the basis that the explanatory comments were volunteered? I'd have to re-look at the record, but that was, we had a sidebar often behind the courtroom where we discussed that at length and that is part of the record. I just don't have an absolute recall of what was discussed at that point. And lastly, the situation of not being allowed, when I'd ask for a full one hour in closing argument, it was not allowed that. I know ten minutes may not sound like a huge point to make, but I think in the context of this case, given the inopportunity, I had to present our theory in opening statement and the disadvantage I was placed at during the beginning of the trial, including the examination of Dr. Tata, that it was only being deprived a brief recess to reconstruct an opening statement that asking for a full hour in the case of this complexity was not undue and the court should have exercised its discretion and allowed that, but the court did not. Counsel, explain to me again why you think this is a case of first impression. Because of the speculation. For this court to finally give some direction in what constitutes quote unquote speculation when an expert witness is testifying based on what experts are allowed to use as a basis for their opinion. And so I tried to clarify earlier, the only speculation in this case, which would be necessary, which is an element of every Ray Sipsa case, is to explain exactly what happened. That's why the doctrine exists. I seem to recall, I think what back in law school wasn't one of the classic Ray Sipsa cases that a piano falls out of a window and kills someone. We all know pianos can't fall out of windows by themselves, but no witnesses, no one to explain how it happened, but the fact that it occurred. It is something that does not ordinarily occur in the absence of negligence and I had testimony that that's what Dr. Piles testified to as to this death occurring in this set of circumstances and that Dr. Tata was in exclusive control of the instrumentality that led to this unfortunate outcome. So this is an opportunity for this court to really clarify what constitutes, what is speculation by an expert or what is a reasonable opinion based on those factors that an expert can reasonably rely. Counsel, thank you. Mr. Grand. Good morning, Your Honors. May it please the court, counsel, Karen DeGrand on behalf of the I don't believe that this case presents any reason for the court to address the issue of speculation or what type of speculation is permissible because the jury heard every bit of speculation that Dr. Piles had to offer. It struck me listening to counsel's presentation today and in reviewing the reply brief in preparation for today's hearing that I had to keep reminding myself that I'm not defending a motion for a directed verdict, I'm defending a jury verdict in favor of my clients and a jury verdict after the jury heard every single bit of speculation or testimony or scientific evidence, however you want to classify it, that counsel described this morning and that's described in the briefs. So I don't generally run into a disagreement as to the standard of review in a case where my opponent is asking for a new trial after judgment is entered on a jury verdict based on a manifest way challenge and then various questions about the procedure of the trial. Those are all abuse of discretion inquiries. That's not a question of law. There's no novel question. The jury heard all of the evidence so there's no reason at all to go down that path and I can certainly take issue with the plaintiff's characterization of circumstantial evidence and what is allowable speculation or testimony when the court allows Ray Sipsa to go to the jury, but there's no point in fighting that battle because the jury heard it all. The jury received that Ray Sipsa instruction that can be nearly devastating to a defendant. The jury heard that and the jury rejected it because the jury heard Dr. Tata's very definite explanation and it was not based on custom and practice, it was his definite explanation of what happened in this case. The Ray Sipsa inference does not allow an expert such as Dr. Piles or anyone else to go back and say, all right, we don't know what happened but I'm going to just speculate to X, Y, and Z as to what might have happened. That's not the Ray Sipsa inference. The Ray Sipsa inference is it was in your control, we don't know what happened, you better explain it. And that is exactly what happened here plus the speculation came in. So I don't understand, I don't follow and I don't agree with counsel's argument in that regard. As to the issue of whether the plaintiff was prejudiced or there was any kind of error that occurred with respect to the court's ruling on the motion to eliminate, I would submit that the record establishes that the court was extraordinarily conscientious, heard and reheard two and three times the plaintiff's plea to allow Dr. Piles' testimony to come in. Two days after the initial ruling, counsel asked for a postponement of the opening statement and the court said, no, we have to go ahead. These jurors have been waiting, we're going ahead. And that seems to me to be a very reasonable reaction by the court. Piles was always competent evidence for Piles to testify that an injection of lidocaine into the drug could or might have resulted in this death, wasn't he? I don't agree with that statement, Your Honor, and I'll tell you why. Because that has to be based on some evidence. It can't be speculation. What turned out to be speculation is whether it did in fact occur. But he was perfectly and had sufficient qualifications to testify that that action could or might have resulted in a death from a medical standpoint. I'm sorry to interrupt. How would it be relevant, though, if there was no competent testimony, not a Ray Zipson case? My only reason for bringing it up is some people seem to be under the misconception that when a doctor says could or might have, he's testifying to something other than the possibility of a mechanism. Yes, the possibility exists that this mechanism could have caused this result, but he still has to prove some, there has to be evidence that it did, or a jury has to accept a Ray Zipson theory. Well, our position was that Dr. Piles shouldn't have been able to testify to that, but I won't waste the Court's time by continuing to disagree because that is what the jury heard. We lost on that point. And I don't think it's correct characterization to say that that plaintiff was horribly prejudiced by the fact that this ruling was made, he put Dr. Tata on the stand in adverse, and then Dr. Byrd and the paramedic. Dr. Byrd and the paramedic had nothing to do with the issues as to what he wanted to cover with Dr. Tata, and that's when Dr. Caliper, the medical examiner, went on. And that's when the Court said, well, I want to listen to this again, think about this some more, had this unusual voir dire procedure that we objected to, lost on that too, and then the Court said, okay, well, I am going to let Dr. Piles testify. And then what happened? Dr. Tata was put back on the stand, and the question is, so if there was any problem, which I don't think there was, I think the judge was right in the first place, it was cured, and there was no request that the other two witnesses who had already been examined should be put on the stand again. There was no request for a mistrial, there was nothing of that sort. At that point in time, plaintiff went forward with the examination of Dr. Tata and Dr. Piles and so on and so forth. So I don't see how there could possibly be any determination that there would be an abuse of discretion with respect to that procedure. As far as the closing argument is concerned, counsel did not object to the length other than based on the fact that the two defense counsel were each going to have 30 minutes. There was no indication, gee, I can't cover all this material in 50 minutes. And as a practical matter, I doubt that this Court would want to get into micromanaging the time for closing arguments, certainly not within 10 minutes. There would probably not be something the Court would want to address. As far as the medical literature, I think Justice Hoffman already said what I would have responded to. The door was open and there was not ever any use of medical literature presented as substantive evidence. The only addressing of the medical literature was by Dr. Tata to explain, well, the literature that the plaintiff raised didn't apply in this situation. He explained that, there was a sidebar, there was a lot of discussion. It could be construed actually that the plaintiff agreed with the way that the issue was worked out and defense counsel moved on to the next topic. I don't think that presents any reason to revisit the verdict in this case based on medical literature. Manifest weight, I certainly disagree that there could be any finding that the verdict was against the manifest weight of the evidence. As the trial court commented at the hearing on the post-trial motion, in his view, the evidence truly supported the defense position and truly supported the initial ruling by the court that Dr. Pyle should not have been permitted to speak but he was permitted. The jury heard it all. The jury heard Dr. Tata explain all of the circumstances. The jury heard even Dr. Case, the pathologist who was presented by the plaintiff, had noted in her notes that potentially the cause here, the cause of the death was cardiac arrhythmia secondary to hypertensive cardiovascular disease. That was pretty convincing, I think. And the cardiologist who was put on rebuttal had a basic fundamental misunderstanding as to what had happened in the case. So I think that what happened here was not that there was any unfairness, not that there was any problem whatsoever. There was certainly no reason to think that the verdict that was in favor of Dr. Tata was in any way inconsistent with the verdict that was presented. The jury proceeded on separate instructions, and there's no reason to revisit this verdict, I don't believe, in any way, shape, or form. Thank you. I do feel I need to address a point made by counsel, and that is some suggestion that Dr. Richard Kerber, who is a professor of cardiology from the University of Iowa, somehow was misinformed as to the facts of this case. In terms of the cause of death, I don't think the record would support any suggestion of that. In fact, he was the only cardiologist who testified in this courtroom to rebut this suggestion that this was a sudden fatal cardiac arrhythmia that occurred for no reason unknown to anyone at this point in time. I want to make it absolutely clear, there was no disagreement among any of the medical experts called, including Dr. Tata and their retained expert, Dr. Pazza, that if lidocaine goes through a hole in the dura, it will result in a respiratory arrest. There was a disagreement, though, as to how quickly it would occur. That was the only disagreement as to the timing of that, and the only evidence that we have of that is that the anesthetic agent took some time to numb the tissues. Like when we all have teeth extractions, they don't pull your teeth right after they shoot you up with lidocaine. It takes some time for the anesthetic agent to take place. That was the testimony of our experts. The only controverting testimony was from Dr. Tata and Dr. Pazza, who gave this sudden onset opinion based only on that, their opinion. But there was no plausible explanation to support the sudden cardiac arrhythmia. The medical examiner did not believe this was a primary cardiac event, and my expert, Dr. Case, refuted the theory that this was a primary cardiac event. The experts all gave an explanation how this was an anesthetic event leading to paralysis of the nerves that operate the diaphragm, causing a respiratory arrest first, then a cardiac arrest that would ensue. That follows exactly the logic followed by the jury in allowing them to find a cardiac arrest, and against Dr. Byrd, while they did absolve Dr. Tata. If this had been a primary cardiac event, a sudden cardiac arrhythmia, this disrupted the electrical system of her heart and caused her heart to stop, no degree of resuscitation with an endotracheal tube, whether it's in the trachea, or in this case, in the esophagus, is going to turn this heart around, because their contention, it was a primary cardiac event. By finding against Dr. Byrd, the jury rejected that cause of death, because they could not have found against Dr. Byrd if they truly found that she had suffered a sudden cardiac event. Counsels, thank you. Matter will be taken under advisory.